*Decision will be entered under Rule 50.*

MARION A. BURT BECK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20112. Promulgated November 16, 1950.

*Watson Washburn, Esq.*, for the petitioner.
*Scott A. Dahlquist, Esq.*, for the respondent.

644

646

648

OPINION.

Van Fossan, *Judge:* The first question is the determination, for the purpose of computing depletion, of the fair market value of the petitioner's interest in the iron ore lands as of March 2, 1919, when she inherited it.

The petitioner, as owner of a one-sixth interest in the iron ore lands, reported a proportionate share of the royalty payments in her tax returns and took a deduction on her share of a depletion allowance of $.1018 per ton of ore. Beginning with the taxable year 1938 through the taxable year 1941 the respondent disallowed a portion of the deduction for depletion taken by the petitioner. In so doing the respondent applied what is sometimes referred to as the dilution theory provided for in section 23 (m). This action of the respondent was in recognition of the fact that the recoverable units of ore were greater than the initial estimate in 1919. He accordingly revised the prior estimate with the result that the depletion allowance for the taxable years was reduced so as to be more in accord with the number of units of ore estimated to remain. Deficiencies based in part on this disallowance of a portion of the former depletion allowance were asserted. The petitioner contends that the valuation placed on her interest at the time she inherited it in 1919 was in error and that instead of a valuation of $916,262.74, the value should be $2,092,802.70. The petitioner urges that a depletion allowance based upon the latter figure is more nearly correct, resulting in a higher amount against which the respondent might apply the dilution theory of section 23 (m).

The executors of the estate of petitioner's father adopted as an estimate of the amount of iron ore then in the lands, the report of the ore remaining made by the lessees of the lands to the State of Minnesota. This report was reviewed by the School of Mines of the University of Minnesota and the tonnage therein of 54,012,682 was agreed to by the respondent in settling the estate of petitioner's father. The property was then under a lease which was to expire in 1950

and was to pay a royalty to the lessors of 25 cents per ton, and a minimum royalty payment of $50,000 a year. This interest was given a present value of $5,195,479 by the executors in the estate tax return. The respondent finally determined the value at $5,497,756.43, the increase being based on the use of a more conservative yield factor in the empirical discount formula used in the computation of the present value of the royalty payments.

The determination of the fair market value of a property of the nature of petitioner's interest in the iron ore lands is difficult even if based on contemporary values. The task becomes increasingly difficult as the valuation date recedes in point of time. Here we are asked to fix the fair market value of this interest as of the time 31 years ago.

The respondent relies on the valuation as finally determined in the estate tax return in 1919 based on an estimate of 54,012,682 tons of ore remaining. That estimate, prepared by the lessee and adopted by the lessor in the estate tax return, was carefully prepared on the basis of the best information then available. The lessee used this estimate as a basis for the State tax paid by it on the value of its interest and also in formulating its work program.

The estimate adopted by the estate and respondent appears to have been tantamount to an arm's length transaction. The interests of the estate were best served by as conservative an estimate as possible. On the other hand, it was in the respondent's best interests to see that all the ore then known to exist was included in the estimate. It is important to note that there was no disagreement between the parties as to the estimate of *tonnage*. The relatively small increase in the *value* of the lessor's interest made by the respondent was acceded to by the estate. As might be expected from the nature of these large ore interests, there was no evidence as to the contemporaneous selling price of anything comparable.

In attempting to show that the value fixed in the estate tax return was erroneous, the petitioner emphasized the valuation of $19,629,-199.36 given the lessee's interest in the lease by the respondent as of 1913 in settling the income tax liability of the United States Steel Co. (The lessee was a subsidiary of United States Steel.) This value is not persuasive in the present inquiry. The amount that the lessors (including petitioner) received in royalty payments was fixed by the lease and had no relation to the value of the lease to the lessee.

The other valuation relied on by the petitioner concerns the lease extension agreed to in 1926. Under this lease extension the 25 cents per ton royalty continued until 1950 but the minimum royalty payment was increased from $50,000 to $687,500 per annum. The petitioner contends that this transaction shows the true value of her inter-

est in the lands as of a time 7 years earlier. It must be pointed out initially that in relying on the terms of the lease extension, petitioner is using facts not known to exist as of the basic date of March 2, 1919, although there was some evidence that in 1919 an extension could have been anticipated. As a general rule in valuation cases, it can be said that facts reasonably capable of being anticipated as of the valuation date may be used in corroborating the original valuation. They cannot, however, be used as a basis for computing a new valuation to supplant the original based on facts then known.

Even if we give to a value, based on the lease extension, the weight urged by the petitioner, she has still not established that the value given her interest in the estate tax proceeding was not reasonably correct. The evidence clearly shows that the estimate of tonnage, (and consequently the present value of an interest therein), as checked by the College of Mines of the University of Minnesota and accepted by the Minnesota Tax Commission, was used in the industry as being the most accurate measurement based on information then known. Acceptance of the accuracy of this estimate by the executors of the estate and the respondent in 1919 supports the view that a fair market value based thereon would be correct.

It is our considered opinion, after weighing the evidence carefully, that the petitioner has not established that the valuation of her interest by the respondent was in error, nor has she proved a more correct valuation. We have found as a fact that the fair market value as of March 2, 1919, of the iron ore lands subject to the lease was $5,497,576.43, of which the petitioner's one-sixth interest was $916,262.74. On this issue, therefore, the respondent is sustained.

The second issue is whether the respondent erred in reducing the depletion allowance in the taxable years under the provisions of section 23 (m) [2] of the Code and the Revenue Act of 1938, *supra.*

As of March 2, 1919, the petitioner's interest in the iron ore lands had a value of $916,262.74. In the period from 1919 to 1937, inclusive, the respondent allowed petitioner depletion of $590,140.42. The table set forth in our Findings of Fact shows the ore mined and the ore reserves estimated by the lessee (as submitted to and accepted by the Minnesota tax authorities).

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

    In computing net income there shall be allowed as deductions:

    *        *        *        *        *        *        *

    (m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. * * *

In 1943, the respondent proposed for the first time a reduction in the petitioner's depletion allowance in order to distribute the remaining undepleted balance of the 1919 value over the remaining years of production on the basis of the current estimates of ore reserves. Extensions of time (waivers) had been agreed upon by the parties for the determination of the petitioner's tax liability for the years 1938 through 1941. Accordingly, the taxable years were still open.

The petitioner's argument on this issue is, first, she had not "ascertained" before the taxable years, that there were greater ore reserves than previously estimated; and second, that to reduce the depletion in the taxable years 1938 through 1941 would be a retroactive reduction since the respondent first proposed a revision of depletion allowances in 1943.

The petitioner relies on *Petit Anse Co.* v. *Commissioner*, 155 Fed. (2d) 797, certiorari denied, 329 U. S. 732. The facts of that case show that at a hearing in the Tax Court on another issue the evidence was brought out that deposits in the taxpayer's mine were greatly in excess of the amount agreed upon in prior years by the taxpayer and the respondent. After all the evidence was in, the Tax Court granted respondent permission to amend his answer so as to ask for an increased deficiency based on the lower rate of depletion resulting from the increased estimate of salt deposits. The Tax Court sustained the respondent. The Circuit Court, in reversing the Tax Court, said:

We interpret this statute to mean that the revision for depletion *when discovered* as a result of operations or development work will be only as to the allowance for depletion in subsequent taxable years, and that there would be no retroactive revision of the depletion allowance for the years before the discoverv of the existence of recoverable units in excess of the prior estimate.

The statute provides that the prior estimate shall be revised and the allowance *"for subsequent taxable years* shall be based upon such revised estimate."

  *   *   *   *   *   *   *

Counsel for the Commissioner, however, undertake to support the decision on the theory that it was a factual finding. They argue that the taxpayer must have learned before the tax years in question of the later estimate by the engineer of its lessee of the additional amount of economically recoverable units of salt in the mine, and having discovered the existence of salt greatly in excess of the previous estimate before the tax years in question, the revision of the depletion allowance should occur as of the time of the discovery of such excess in the course of operations. There are two answers to this contention, viz: (1) There is no evidence to support a finding that the taxpayer had discovered it before the tax years, or at any time before trial; and (2) the Judge of the Tax Court never undertook to make any such finding.

In our opinion, the petitioner derives no support from the *Petit Anse* case. In that case the manner in which the question of revision of depletion arose is sufficient in itself to distinguish the two cases. The record in the *Petit Anse* case shows that the witness, from whom came the evidence of greater reserves, surprised both parties by his testimony

based on facts which the witness had uncovered only a month before the hearing. In the present proceeding the whole record clearly supports the view that it was apparent to every one concerned, when the annual estimate of reserves decreased only slightly over the years, despite continual removal of large amounts of ore, that, in the words of the statute, "the recoverable units were greater * * * than the prior estimate thereof."

In the *Petit Anse* case the subject of depletion allowance was a salt reserve. There was no evidence in that case of a system of an estimate of reserves for purposes of a State tax, which estimate was a matter of public knowledge. The petitioner in these proceedings attempts to minimize the public nature of the estimates of ore accepted by the Minnesota authorities, but the record indicates on the contrary that they were accepted and used in the industry. It is well to note that the petitioner's argument on the first issue was that the 1919 estimate was incorrect because it was ascertainable on that date, on facts then known, that the ore reserves were much greater than previously estimated. Yet on this issue, petitioner, as above stated, contends that it "is in no sense, an 'ascertainment'" of the veracity of the facts on which the argument is based, "much less an effective 'revision' [of depletion] retroactively binding on her."

In other words, petitioner argues on the first issue that on facts known in 1919 the reserves were greater than estimated but on this issue she argues that she had not "ascertained" those same facts in 1938.

The petitioner's argument on this point seems to anticipate the damaging result of a finding that she knew, prior to the tax years, "that the recoverable units [were] greater * * * than the prior estimate thereof"—section 23 (m). We believe that the record amply supports our finding of fact that the petitioner, on the basis of facts known and reasonably ascertainable in the taxable years, had discovered that the recoverable units of ore were in excess of the prior estimate. Our conclusion in this respect disposes of the petitioner's argument on this point.

The petitioner's other argument on this issue is that, assuming that she had "ascertained" the need for a new depletion rate, nevertheless, the "subsequent taxable years" of section 23 (m), to which the revised depletion shall apply, means the years subsequent to the determination by the *respondent* that a revision of depletion should be made.

The petitioner seems to imply that before there can be any adjustment of depletion, there must be some sort of formal action, meeting of the minds or agreement of the parties to the effect that it has been "ascertained" that the number of recoverable units are more or less than originally estimated.

The statute contemplates no controversy as to when the "ascertainment" was made. It implies that the taxpayer himself, under our system of self-levy, makes the correct adjustment when he himself ascertains the need for correction in depletion rate. The statute does not imply that the party to whom it would be an immediate tax-wise advantage to suppress the information of a need for adjustment, has any privilege not to come forward and make the necessary correction in the return. Petitioner here tacitly admits that an adjustment in depletion is indicated and it is apparent from the facts that an adjustment has been warranted since the early 1920s when it was clearly apparent that the amount of ore estimated to remain continued fairly constant despite continual mining.

By no possible interpretation of the statute can it be said that it is the duty of the Government to ferret out the fact that a correction in depletion is in order. If the petitioner's view of the statute were to prevail she could wait in vain for the Government to "ascertain" that the recoverable units happened to be less than estimated, which latter happenstance would otherwise dictate a correction to the immediate tax advantage.

The pertinent section of the respondent's regulations have been in effect in substantially the same form since the 1932 Act. The current Regulation is 111, sec. 29.23 (m)-9, which reads, in part, as follows:

If the number of recoverable units of mineral in the property has been previously estimated for the prior year or years, and if there has been no known change in the facts upon which the prior estimate was based, the number of recoverable units of mineral in the property as of the taxable year will be the number remaining from the prior estimate, but in any case in which it is *ascertained either by the taxpayer or the Commissioner* as the result of operations or development work prior to the close of the taxable year that the remaining recoverable mineral units as of the taxable year are materially greater or less than the number remaining from the prior estimate, then the estimate of the remaining recoverable units shall be revised and the annual depletion allowance with respect to the property for the taxable year and for subsequent taxable years will be based upon the revised estimate unless a change in the facts requires another revision. Such revised estimate will not, however, affect the basis for depletion. [Emphasis added.]

It is apparent that it was not intended that there was to be any right on the part of the taxpayer not to make an indicated correction in depletion simply because to do so would spread his undepleted capital over a longer period of time. The regulation uses the same mandatory language as the Code in section 23 (m), viz: [The erroneous depletion rate] "*shall* be revised." There is no room for an interpretation that a change in depletion rate *may* be sought only by the taxpayer and then only if it suits his present tax planning. This point was dealt with in *Big Four Oil & Gas Co.*, 28 B. T. A. 61,

affd., 83 Fed. (2d) 891. There we said, in language which is suggestive of the current regulations, that:

Article 230 of Regulations 74 provides:

*Determination of quantity of oil in ground.*—In the case of either an owner or lessee it will be required that an estimate, subject to the approval of the Commissioner, shall be made of the probable recoverable oil contained in the territory with respect to which the investment is made as of the basic date. The oil reserves must be estimated for all undeveloped proven land as well as producing land. When information subsequently obtained clearly shows the estimate to have been materially erroneous, it may be revised with the approval of the Commissioner.

From the foregoing the petitioner reaches the conclusion that a revised estimate may be made by the owner or lessee but not by the Commissioner, and that the latter's function is restricted to approving or disapproving the estimate submitted.

We can not concur in that viewpoint. The regulation does not specify who shall make the revised estimate, should one be necessary. It simply provides that an erroneous estimate may be revised with the approval of the Commissioner. If the latter makes the revision himself, fairly and without arbitrary caprice, it may be assumed that he approves his own handiwork. In such case the requirements of the regulation will have been fully met. If the taxpayer submits a revised estimate which the Commissioner does not approve, and then another, and keeps on until approval is finally won, the ultimate result is that the Commissioner has, in effect, made the revision. We find nothing in the regulations to prevent the Commissioner from doing directly that which, as petitioner contends, he might do circuitously.

We said further in that case that:

Petitioner further contends that the changed unit rate of depletion can not be applied to the year 1928, on the ground that it was not until February 7, 1931 (date of the 60-day letter), that the Commissioner determined new estimates of the oil reserves of the leases and changed the unit rate of depletion as of January 1, 1928. Several decisions are cited to the effect that revised estimates and depletion rates may not be applied retroactively.

The evidence discloses that during the year 1928 an error in the original oil estimate was discovered. It does not appear just when the new estimate was made, but certainly there was no acceptance of the original estimate as a basis for allowing depletion deductions for 1928. But although the reestimate may have been computed subsequent to the taxable year, it was a part of the due consideration given to the determination of the proper tax for that year. * * * [There follows a discussion of *Sterling Coal Co., Ltd.*, 8 B. T. A. 549; *Staub Coal Co.*, 16 B. T. A. 584; *Stouts Mountain Coal Co.*, 4 B. T. A. 1292; and *Kehota Mining Co.* v. *Lewellyn*, 28 Fed. (2d) 995, affd., 30 Fed. (2d) 817]

* * * In the light of the above decisions it seems clear that the revised estimate in the present proceeding, made upon facts appearing during 1928, may properly be applied in determining the depletion allowance for that year, and we so hold. * * *

We believe that it is apparent from the foregoing that the respondent did not err in reducing the petitioner's depletion allowance in the taxable years, and we so hold.

The third issue is whether the petitioner's share of the Federal estate taxes and the State inheritance taxes paid by the trustee for the heirs (including petitioner), should be included in petitioner's gross income.

The petitioner and her co-heirs contested the will of the petitioner's father. This contest resulted in a compromise agreement dated July 1, 1920, by the terms of which the Minnesota iron ore lands and $720,000 in cash were conveyed to petitioner and her co-heirs. The compromise agreement also provided that the trustee under the will of petitioner's father was to pay the Federal estate taxes and the State inheritance taxes due on the share of the estate distributed to petitioner and her co-heirs. The agreement further provided that the trustee was to be repaid this money advanced for taxes by withholding certain sums from the royalty payments, which, as trustee of the ore lands, it was to pay to petitioner and her co-heirs. The trustee paid taxes, Federal and State taxes, for the heirs in the amount of $1,356,400.

In 1926 the heirs modified the agreement for the repayment of the money advanced by the trustee for payment of taxes. Under the terms of the 1926 agreement, the trustee credited to its account in reduction of the loan, amounts of $56,516.67 annually, beginning July 1, 1926, through July 1, 1949. For the taxable years 1937 through 1941, petitioner did not include in her income any part of the royalty payment withheld by the trustee in repayment of the loan. The respondent added $9,419.44 (one-sixth of the annual payments of $56,516.67) to petitioner's taxable income for each of the years involved herein.

It is clear that the heirs were to pay the Federal and State taxes on the share of the estate received by them. The manner of payment of these taxes is a thing apart from the nature of the obligation itself. The obligation arose out of the settlement agreement and was one of the conditions attached to the distribution of the property to the heirs. The manner of financing this payment of taxes can have no bearing on the nature of the obligation. It was so arranged that the trustee under the will would also hold in trust and manage the iron ore lands distributed to petitioner and her co-heirs, but this trust relation does not obscure the fact that the heirs were indebted to the trustees.

The petitioner argues that there was no debtor-creditor relationship and that there was no personal obligation on the part of petitioner and her co-heirs to pay anything. This view is without merit and is directly opposed to the patent purpose and method in the advance and repayment thereof involved here. The argument cannot be seriously urged that this arrangement consisted of anything more or less than: an obligation to pay certain taxes which obligation was but one of the terms of a compromise; a loan of funds to pay those taxes,

and repayment of the loan out of royalties due the petitioner and her co-heirs from property mortgaged to the lender as security for repayment. The cases cited by the petitioner are not persuasive of any other view.

It follows that the amounts representing the petitioner's share of the royalty payments withheld by the lender-trustee in repayment of the loan were income to the petitioner, and we so hold.

This is not an end of this question, however, for the petitioner contends, in the alternative, that her proportionate share of the Federal estate taxes constituted additional cost of iron ore lands which cost should be "returned to her by way of exhaustion allowances."

If the petitioner intends the term "exhaustion allowances" to be interpreted as subject to depletion her contention is without basis because depletion in this case is *not* based on what she had to pay out to get her inheritance. The basis for depletion is the basis used for determining the gain upon the sale of the property, section 114 (b) (1). But the basis for determining the gain upon sale is, in the case of *inherited property*, the fair market value when it was acquired, section 113 (a) (5). It is *not* the petitioner's out-of-pocket costs added to the fair market value which total amount is subject to a depletion allowance; it is the fair market value of the property.

The heirs paid the taxes on the property they inherited. The difference between that amount and the fair market value of their property was the extent to which they benefited by the inheritance but this, by the clear meaning of the statute, has no relation to the basis for depletion.

The petitioner cites *Irene C. Moffett*, 14 T. C. 445 (on appeal CA-2, August 9, 1950) in support of her contention. In that case the taxpayer was required to pay the estate tax deficiency to prevent transferee assessment and the filing of a lien against annuity contracts which were included in her husband's estate. It was held that the payment was made for the protection of the taxpayer's rights as annuitant and constituted a capital expenditure recoverable by amortization.

The petitioner contends that the *Moffett* case supports her view "by analogy." If by this it is proposed that the amount paid in taxes should be amortized, then this contention, too, must fail. The *Moffett* case lends no support to petitioner's argument since that decision is based on such a different factual situation that the reasoning cannot be considered to apply here. There was here no payment "made for the protection and preservation" of petitioner's rights which, as such, "constitutes a capital expenditure." Petitioner agreed to be charged with and later paid the taxes here because it was so provided by the terms of the compromise agreement. There is no way this payment of taxes can be considered analogous to an expenditure to *protect* and *preserve*.

A further reason why petitioner's view should not prevail suggests itself. If estate taxes, paid proportionately by agreement between the recipients of legacies, were considered to be subject to "exhaustion allowances" then as to every such case the estate tax provisions of the law would come to naught for the original payments of those taxes would be recovered by the taxpayer by deductions over the years and the net gain in revenue to the government from the estate tax would be nil.

Accordingly, we hold that the petitioner may not deduct as an "exhaustion allowance," any part of the Federal estate taxes paid on her share of the property.

Further, in the alternative, petitioner claims that the amounts withheld from her royalties by the trustee in payment to it for the money advanced for the payment of estate taxes "should be allowed to her as a deduction in each of the taxable years herein, under section 23 (a) (2) of the Internal Revenue Code, as an ordinary and necessary expense paid or incurred for the production or collection of income from said ore lands."

The contention is without merit for the reason given above, viz, the petitioner would in this manner recoup the estate taxes previously paid with no gain resulting to the government therefrom. This clearly is not within the purview of the law and there were no cases cited nor reasoning offered to support the view. Such a deduction for Federal estate taxes has never been allowed. A deduction cannot be sustained here by calling the amounts repaid on a loan made for the purpose of financing payment of estate taxes an ordinary and necessary expense.

The fourth issue is whether the income from certain trusts created by the petitioner should be taxed to her.

The following explanation was made in the deficiency notice for the inclusion in *each* of the taxable years of additional income:

The income from the trusts created by you on March 25, 1932, November 22, 1937 and January 8, 1938, for the benefit of your husband Walter Beck, is held to be taxable to you under the provisions of the Revenue Act of 1938 and the Internal Revenue Code.

On March 25, 1932, petitioner conveyed to herself and Watson Washburn (her attorney), as trustees, an undivided one-half interest in her share in all the leased iron ore lands. This trust provided that the net income was to be paid to petitioner's husband, Walter Beck, for his life and that the trust principal would be conveyed to the survivor of the petitioner and her husband. The petitioner reserved the right at any time during her lifetime after December 31, 1937, to revoke the trust indenture. Pursuant to this power, the trust was revoked on January 8, 1938, by an agreement between the parties,

which agreement further provided that the husband waived his right to any part of the trust income accruing after December 31, 1937.

The only question as to the 1932 trust is whether the income accruing to the husband for the last quarter of 1937 but paid him in 1938, should be included in petitioner's 1938 gross income. In order to answer this question it will be necessary to consider the 1932 trust along with the trusts of 1937 and 1938 for if the decision as to the 1932 trust is that the income therefrom is taxable to petitioner, then the 1937 income from that trust paid in 1938 is taxable to petitioner in the latter year inasmuch as petitioner is on a cash basis and could not have constructively received it in the prior year.

On November 22, 1937, the petitioner transferred to herself and Watson Washburn, as trustees, an undivided one-twentieth interest of her one-sixth interest in all the leased iron ore lands upon trust to pay over the net income to the petitioner's husband, Walter Beck, during his life and upon his death to convey the principal thereof to the petitioner.

On January 8, 1938 (the date she revoked the 1932 trust), petitioner created another trust with terms the same as those of the 1937 trust except that it was for an undivided four-twentieths interest. Thus under the terms of the two trusts the husband received five-twentieths of the income from the petitioner's one-sixth share in the iron ore lands. Substantially, the only income received by the petitioner's husband, Walter Beck, in the taxable years was derived from the trusts.

The problem presented by the trusts is a familiar one. It has been expressed in various ways but in substance it requires a decision whether, in reality, the income from the trust created by the taxpayer-grantor should properly be considered income to the grantor or to the trust beneficiary. It is generally accepted that, although the precise situation is not governed by statute, the problem is within the purview of section 22 (a), which provides for the inclusion of income of "whatever kind and in whatever form paid."

The respondent relies chiefly on the following cases: *Lucas* v. *Earl*, 281 U. S. 111; *Burnet* v. *Leininger*, 285 U. S. 136; *Helvering* v. *Clifford*, 309 U. S. 331; *Helvering* v. *Horst*, 311 U. S. 112; *Harrison* v. *Schaffner*, 312 U. S. 579; and *Commissioner* v. *Tower*, 327 U. S. 280.

In our opinion, respondent extends the force of his cited cases to a degree which encroaches upon the authority of *Blair* v. *Commissioner*, 300 U. S. 5. In that case the beneficiary of a trust assigned for the period of his life, a part of the trust income. It was held that the income so assigned was not taxable to the assignor. In the solution of this problem the courts have generally based the result on either the nature of the property transferred (i. e., assignment of future earnings held taxable to assignor in *Helvering* v. *Horst*) or the period

for which the property was transferred. In *Harrison* v. *Schaffner*, the life beneficiary of a trust assigned specified amounts of income for one year at a time. The income was held taxable to the donor, the Court saying "We think that the gift by a beneficiary of a trust of some part of the income derived from the trust property for the period of a day, a month. or a year involves no such substantial disposition of the trust property * * *," impliedly, as in the *Blair* case. The Court prescribed no rule but left it for "* * * future judicial decisions to determine precisely where the line shall be drawn between gifts of income-producing property and gifts of income from property of which the donor remains the owner, for all substantial and practical purposes." In most of the cited cases the question concerns the assignment by the life beneficiary of the trust of the income therefrom for a definite period. In *Harrison* v. *Schaffner*, an assignment of one year was insufficient. In *Hawaiian Trust Co., Ltd.* v. *Kanne*, 172 Fed. (2d) 74, assignments by a trust beneficiary of trust income for a period of approximately 10 years were held to exclude the income from taxability to the donor. A similar assignment for 10 years was also held to be a sufficient period of time in *Farkas* v. *Commissioner*, 170 Fed. (2d) 201.

In the present case the transfers by the wife to the husband in two of the trusts of a part of the wife's interest in the iron ore lands were for the life of the donee, the husband. In our opinion, this is sufficient to exclude the income from 1937 and 1938 trusts from taxability to the donor under the principles of *Blair* v. *Commissioner*, *supra*, and *Harrison* v. *Schaffner*, *supra*, and we so hold. The 1932 trust is somewhat different, however. This trust was revocable after 1937 and was revoked by petitioner in 1938. In our opinion, the length of time for which petitioner parted with control of the property transferred by the 1932 trust is insufficient to cause the income to be taxable to the transferee in trust on the authority of the cases cited above. The income of the 1932 trust being taxable to petitioner, the accrued income of that trust for the last quarter of 1937, but paid petitioner's husband in 1938, is taxable to petitioner, who was on a cash basis in the latter year.

The fifth issue is whether the petitioner is entitled to a deduction for gifts to an educational trust of her supposed interest in the residuary trust of personal property under her father's will. The pertinent section of the Code is section 23 (o) as set forth in the margin.[3]

---

[3] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

  *      *      *      *      *      *      *

(o) Charitable and Other Contributions.—In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

  *      *      *      *      *      *      *

(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and

The petitioner's husband is an artist and was interested in oriental garden art and landscape architecture. He used his talents in this field to develop the grounds of petitioner's home known as "Innisfree" as a showplace of oriental garden art. It was the petitioner's intention to make a testamentary disposition of the property to Harvard University for the furtherance of interests of this type of art.

In each of the years 1939, 1940, and 1941, the petitioner transferred to Walter Beck (her husband), Wellington R. Burt (her nephew), and Watson Washburn (her attorney), as trustees, an undivided one-fiftieth interest in what she believed to be her remainder interest in the trust of personalty under her father's will. The purpose of these trusts was to provide the recipient of the home on the death of petitioner with funds to continue this project in landscape architecture.

In 1940 the petitioner was advised by competent legal counsel that the "legal heirs" who, under her father's will, would succeed to a proportionate interest in a large trust of his personalty, "are ascertainable as of the date of his death and that they took and now have vested remainder interests." A suit for construction of the will was brought, resulting finally in a decision in the Michigan Supreme Court which held, by a vote of five to two, that the words "legal heirs" in the will of petitioner's father meant the legal heirs determined as of the termination of the trust of his personalty. This decision made it practically impossible for petitioner ever to realize anything from her father's trust of personalty since the petitioner's life expectancy is much less than the probable term of her father's trust. In any event, the petitioner concedes that after the Michigan decision her interest in the trust had no value and that she transferred nothing to these trusts. That, however, does not solve the problem because we must determine what the value was, if any, in the petitioner's *asserted* interest in the trust under her father's will as that value was measured at the time the petitioners' trusts were created and prior to the Michigan decision.

The corpus of the trust of the personalty under the will of petitioner's father had a value on May 31, 1940, of approximately $6,900,000; on May 30, 1941, approximately $7,100,000, and on May 31, 1942, a value of approximately $7,300,000. The petitioner's interest in this trust would have been one-sixth had she been held to have a vested interest. In each of the years 1939, 1940, and 1941, when she transferred one-fiftieth of her then asserted interest to the chari-

operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

•          •          •          •          •          •          •

table trust, she filed a gift tax return reporting a valuation of the interest transferred in each year of $20,000 and paid, under protest, a tax based on that value, contending that the gifts were exempt from tax. The respondent asserted deficiencies based on a higher value. The controversy over the gift taxes was pending in this court when the Michigan decision was rendered. Following the Michigan decision it was stipulated that there were no deficiencies in gift taxes for the years 1939, 1940, and 1941 and respondent refunded the gift taxes paid on these gifts.

In her income tax returns for the taxable years 1939, 1940, and 1941, the petitioner listed among her other charitable contributions in each year, the sum of $20,000 as the present value of the interest transferred in each year to the trust for the maintenance of "Innisfree." The respondent has disallowed the deductions for that part of the maximum of 15 per cent of net income represented by these gifts.

The petitioner contends that this amount should be no less than $10,000 and that this amount represents the fair market value of these gifts in each of the years 1939, 1940, and 1941. We cannot agree.

True it is petitioner thought she had given away something of value. The subsequent court decision held contra. Its effect is retroactive in logic and in consequence. As a matter of fact, she gave away nothing of value. Were we to be mistaken in this aspect, there is another reason for sustaining the respondent, i. e., there is no basis in the record by which to fix a value even though a speculative value be indicated. We sustain the respondent.

The sixth issue is whether the petitioner is entitled to a deduction for an alleged payment of $1,500 made in 1940 for legal services rendered. The pertinent section of the Code is 23 (a) (2), as set forth in the margin.[4] Section 121 (d) of the Revenue Act of 1942 made the amended section 23 (a) (2) of the Code applicable to taxable years beginning after December 31, 1938.

The first question under this issue is the matter of proof of payment.

The petitioner agreed to pay a one-fifth share of a legal fee of $5,000. This was the fee charged petitioner and others who sought a construction of the Burt will in Michigan. This suit terminated in a decision of the Michigan Supreme Court to the effect that petitioner was not a "legal heir" within the meaning of that term as used in

---

[4] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

(a) EXPENSES.—

*    *    *    *    *    *    *

(2) NON-TRADE OR NON-BUSINESS EXPENSES.—In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income

her father's will and so had no vested interest in her father's trust of personalty. It is apparent that the petitioner must have paid at least her share of the legal fee in the amount of $1,000 in 1940. She contends, however, that the total amount paid was $1,500. We are unable to find in the record any support for the contended payment of $500 above the amount of fee contracted for, other than petitioner's testimony that "I think [the expense of litigation I paid was] about $1,500." Petitioner suggests on brief that the additional $500 was her share of the attorneys' expenses but this is not supported by any proof, much less sufficient proof to sustain a deduction. Accordingly, we have found that petitioner in 1940 paid attorneys' fees in the amount of $1,000 only.

The next question under this issue is whether the payment is deductible under the pertinent section of the Code. The respondent contends that no part of the attorneys' fees should be allowable as a deduction, relying only on the part of Regulations 111, section 29.23 (a)-15 which reads as follows:

* * * Expenditures incurred in protecting or asserting one's rights to property of a decedent as heir or legatee, or as beneficiary under a testamentary trust, are not deductible expenses. * * *

The petitioner, in support of the view that the payment is deductible, cites *Bingham* v. *Commissioner*, 325 U. S. 365; *Howard E. Cammack*, 5 T. C. 467; *Heller* v. *Commissioner*, 147 Fed. (2d) 376, certiorari denied, 325 U. S. 868; *Hochschild* v. *Commissioner*, 161 Fed. (2d) 817; *Rassenfoss* v. *Commissioner*, 158 Fed. (2d) 764; and *Mary deF. Harrison Geary*, 9 T. C. 8.

Section 23 (a) (2) is generally considered to have been enacted following the repercussions of *Higgins* v. *Commissioner*, 312 U. S. 212, where it was held that a taxpayer holding investments and subject to tax on their income was not entitled to deduct the expenses in connection therewith because he was not deemed to be engaged in "business". Cf. Mertens "Law of Federal Income Taxation" sec. 25.120 1949 Supp. We mention the *Higgins* case here because in our opinion it is a clearly defined example of the nature of deductions for which Congress intended to provide, i. e., a deduction for the expenses of an individual incident to the production of income against which, had the individual been a "business," the deductions would be allowable as a business expense under section 23 (a) (1). The Supreme Court in *Bingham* v. *Commissioner*, 325 U. S. 365, said "Section 23 (a) (2) is comparable and in *pari materia* with § 23 (a) (1), authorizing the deduction of business or trade expenses." In that case, cited by the petitioner, trustee paid for legal fees incident to the contest of a tax deficiency of the trust; legal fees in connection with payment of a cash legacy, and legal fees in connection with tax

and other problems arising upon expiration of the trust and relating to final distribution of the trust fund. The court said that "* * * the trust, a taxable entity like a business, may deduct litigation expenses when they are directly connected with or proximately result from the enterprise—the management of property held for production of income. [Citing cases.]"

There is no analogy to "management of property" in the present proceedings. Petitioner here paid legal fees in attempting to get the property—not to manage what she had. In *McDonald* v. *Commissioner*, 323 U. S. 57, it was held that the campaign expenses of one unsuccessfully seeking reelection as a Pennsylvania court of common pleas judge for a 10-year term was not allowable as a deduction under section 23 (a) (2). The court said "* * * his campaign contributions were not expenses incurred in being a judge but in trying to be a judge for the next ten years."

In *Mary deF. Harrison Geary*, *supra*, cited by petitioner, the taxpayer was a life beneficiary of a trust which owned unproductive realty. In 1942 the taxpayer procured a court decree holding that the carrying charges on trust property had been improperly paid by the trustee from trust income instead of principal. Under the decree the taxpayer was awarded her share of amounts equal to the trust income which had been improperly used. The Tax Court held *inter alia* that the attorneys' fees paid by the taxpayer in procuring the court decree were deductible under section 23(a) (2) as an expense incurred for the collection of income, relying on *Stella Elkins Tyler*, 6 T. C. 135.

In the *Tyler* case we said:

[The attorney's fees were] directly connected with income currently distributable to petitioner under the terms of the trust, and without such outlay it appears that she would have collected one-eighth of the trust income rather than the one-sixth interest to which she was entitled. She brought the suit for the purpose of having the will construed to determine the extent of her interest thereunder, and the expense to which she was put gave rise not to a new interest, but only to the payment of that portion settled upon her by the trustor. It was an expense directly connected with the collection of income that was hers by bequest and was not a cost of creating or acquiring property, or an interest therein itself.

These two cases bring out the basic distinction between the theory that allows a deduction for the expense of *collecting income* to which one already has a right and petitioner's theory in the present proceedings. In our opinion section 23(a)(2) was not intended to allow a deduction for attorneys' fees of the nature of those incurred by petitioner here, and we so hold.

*Decision will be entered under Rule 50.*