Estate of Walter Beck, deceased, Marion A. Burt Beck, Executrix v. Commissioner.
Estate of Beck v. Commissioner
Docket No. 56897
United States Tax Court
T.C. Memo 1960-65; 1960 Tax Ct. Memo LEXIS 228; 19 T.C.M. (CCH) 336; T.C.M. (RIA) 60065; March 31, 1960
Watson Washburn, Esq., 36 West 44th Street, New York, N. Y., for the petitioner. Clarence P. Brazill, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the income taxes of Walter Beck in the amounts of $1,213.38 for 1939, $2,525.12 for 1940, and $4,138.65 for 1941. Subsequently Walter died testate. Marion A. Burt Beck is his executrix and filed the petition herein on behalf of his estate. The petitioner herein denies the existence of any deficiencies and claims overpayments in the amounts of $44.71, *229 $90.16, and $145.29 for those years, respectively. The deficiencies result from respondent's determination that Walter "understated [his] distributable share of income from the Walter Beck Trust dated November 22, 1937 for the taxable years ended December 31, 1939, 1940 and 1941 in the respective amounts of $7,736.79, $8,276.90 and $9,219.34 * * *." In the petition the following errors are alleged: "(a) The increase in the taxpayer's royalty income from the Walter Beck Trust of $7,736.79 in 1939, $8,266.56 in 1940 and $9,213.61 in 1941. "(b) The failure to reduce the taxpayer's income from the said trust in the amount of $625 in each of said years (less the appropriate depletion on said $625)." From the allegations of fact in the petition, the opening statements of counsel, the briefs of the parties, and the entire record herein we consider that the following questions are posed for our solution: Whether, for the purpose of determing the basis for the proper depletion allowance on royalty payments, the respondent erred in determining the fair market value of certain Minnesota iron ore land subject to lease on March 2, 1919, the date an interest in the land was acquired *230 by inheritance by the grantor of a trust of which the decedent was the life beneficiary, to which trust the grantor had conveyed a part of her interest in such land. Whether the respondent erred in making a downward revision of the depletion allowance for the taxable years under section 23(m) of the 1939 Internal Revenue Code. Whether the respondent erred in including in the decedent's distributable income from a trust for the taxable years a proportionate share of an annual payment withheld out of royalties from ore land in repayment of an indebtedness for Federal estate and State inheritance taxes theretofore paid on behalf of the grantor of the trust, to which trust the grantor had conveyed a part of her interest in such land and royalties subject to charges against them. Whether the respondent erred in including in the decedent's distributable income from such trust for the taxable years a proportionate share of an annual installment withheld out of royalties to repay an advance of $300,000 by the lessee to the lessors (one of which was the grantor of the trust) under the terms of a 1926 lease extension agreement on the iron ore property involved herein. Neither party, *231 in opening statement of counsel or on brief, suggests that there is any other issue involved herein. Findings of Fact Some of the facts have been stipulated. We incorporate herein by this reference the stipulation of facts and the numerous exhibits attached thereto and identified therein. Walter Beck, deceased, filed Federal income tax returns for the calendar years 1939, 1940, and 1941 with the then collector of internal revenue for the fourteenth district of New York. The decedent was a resident of Millbrook, New York, at the date of his death on September 5, 1954. Marion A. Burt Beck is a resident of Millbrook, New York. She was appointed executrix of the decedent's estate by order of the Surrogate's Court of Dutchess County, New York, on September 29, 1954. During the taxable years involved herein the decedent was the life income beneficiary of a trust established by his wife, Marion A. Burt Beck, to which she transferred an interest in certain inherited Minnesota iron ore land, subject to lease, all as more particularly hereinafter mentioned. Marion A. Burt Beck is the daughter of Wellington R. Burt of Saginaw, Michigan, who died on March 2, 1919, leaving a large estate *232 consisting principally of stocks and bonds and also valuable iron ore lands on the Mesabi Range in the State of Minnesota the bulk of which was leased. Burt's last will, inter alia, left most of his estate in trust, provided for comparatively small annuities to his children and grandchildren, and provided for final distribution, among his "legal heirs," of the real estate at the death of his two grandsons and of the personal property 21 years after the death of his last surviving grandchild. Burt's four surviving children, the child of a deceased daughter, and three children of a deceased son (referred to hereinafter as heirs) joined in a contest of Burt's will, which resulted in a compromise agreement with the Second National Bank of Saginaw, the executor and trustee under Burt's will. By the terms of the compromise agreement the heirs, who were parties thereto, surrendered their annuities under the will and received all of Burt's iron ore lands and $720,000 in cash. Marion A. Burt Beck, as one of Burt's surviving children, acquired under the compromise agreement one-sixth of the cash and a one-sixth undivided interest in Burt's iron ore lands. The compromise agreement, dated *233 July 1, 1920, was approved by the Circuit Court in Chancery for the County of Saginaw on July 27, 1920. In accordance with the Circuit Court's judgment an order was entered in the Probate Court admitting to probate, as the will of Wellington R. Burt, the will (including the codicils) as modified by the compromise agreement. No appeal was taken and those orders became final. The settlement and distribution of the Burt estate in Minnesota was closed by the final order of the Probate Court on February 3, 1922, which described the Minnesota property owned by Burt at the time of his death (consisting principally of the iron ore properties hereinabove referred to) and ordered and decreed that the property, including all of decedent's interest in the mining leases, be assigned to and vested in specified proportions in certain named persons, their heirs, and assigns. The compromise agreement provided in section 4 thereof that the Burt heirs "are to be charged with" that proportion of the Federal estate tax and State inheritance taxes which the aggregate value of the money and iron ore lands they received under the agreement bore to the value of the entire estate and, further, that the *234 valuation for Federal estate tax purposes would be used in such apportionment. Section 5 of the compromise agreement provided that the "tax so chargeable against" the Burt heirs "shall in the first instance, be paid by the * * *, executor or trustee" from funds of the estate other than money and property going to the Burt heirs and "shall be repaid" as prescribed in section 6 of the agreement in 26 equal annual payments, to begin 5 years from the date of the final decree approving the agreement, with interest at 4 per cent per annum from July 1, 1920. Section 6 of the compromise agreement provided, inter alia, that to secure the repayment of the "indebtedness" of the Burt heirs the trustee under the will "shall be vested with the legal title in trust" to all of the estate's leased iron ore land, to control and manage the same, to collect and distribute the royalties therefrom, to retain from the royalties sufficient amounts to pay the interest and installments on the said "indebtedness," and to distribute the balance to the Burt heirs, their heirs, and assigns. Section 7 of the compromise agreement provided that the money so repaid on the indebtedness of the Burt heirs should be held *235 by the trustee under the will as a separate trust fund and accumulated as such until the payment of the last installment of the indebtedness, and thereafter the income of such accumulated trust fund should be paid quarterly to the descendants of Burt, per stirpes, until the end of such separate trust which was to be at the same time as the end of the trust of personalty created by Burt's will (i.e., 21 years after the death of Burt's last surviving grandchild). The bulk of the Minnesota iron ore land owned by Burt at the date of his death on March 2, 1919, was leased to two subsidiaries of the United States Steel Corporation. One lease covered a seven-sixteenth interest in a small parcel of land owned by Burt, was dated July 19, 1902, and named as lessee the Oliver Iron Mining Company. This lease provided for a royalty of 30 cents a ton with an annual minimum rental of $10,000. The more important lease covered a large acreage of land and was known as the "Burt Lease." The depletion question here involved relates to the "Burt Lease." That lease was to the Lake Superior Consolidated Iron Mines for a term of 50 years from January 1, 1900, for the purpose of exploring for, mining, and *236 shipping "merchantable iron ore" which term was stated to mean "such ore as shall be merchantable from time to time as the work of mining progresses." The lessee agreed to pay quarterly a royalty of 25 cents a gross ton on all iron ore mined and shipped. Further, the lessee agreed to mine and ship at least 200,000 tons as a minimum output per year, or otherwise pay a minimum annual payment of $50,000 as advance royalty or ground rent against which the lessee was entitled to credit for ore subsequently mined and shipped. The lessee convenanted to conduct all its mining operations in a good work-manlike manner and in accordance with the requirements of good engineering. On January 1, 1926, the lease to the Lake Superior Consolidated Iron Mines was extended by an agreement between that company, the heirs who owned the lands under the compromise of July 1, 1920, and the trustee under an indenture of trust between the heirs and the trustee dated July 1, 1920. The lease extension agreement extended the original lease for an additional 30 years from January 1, 1950, and amended certain terms of the lease. The amendments provided, inter alia, for a royalty of 25 cents a gross ton on all *237 iron ore mined and shipped, with a minimum annual output of 2,750,000 tons or annual payments of $687,500 to the trustee as advance royalty or ground rent during the period from January 1, 1926, and prior to January 1, 1950, and, further, provided for a royalty of 50 cents a gross ton, with 400,000 tons minimum output or $200,000 advance royalty per year during the period after January 1, 1950. The lease extension agreement also provided that: "As part of the consideration for the making of this agreement the Lessee has loaned to the Trustee, for the benefit of the parties of the first part [the heirs], contemporaneously with the execution and delivery of this instrument, the sum of three hundred thousand dollars ($300,000.00), the receipt of which is hereby acknowledged; and it is agreed that at the option of the Trustee, at any time on or before January 1, 1930, said loan may be repaid in whole or in part in cash without interest, but if not so repaid then it shall be repaid without interest in the following manner; the Lessee shall be entitled to and shall have credit for said amount at the rate of one dollar ($1.00) of credit upon every forty-five and 83-1/3/100 dollars ($45.83-1/3) *238 becoming payable by the Lessee to the Trustee on and after April 20, 1930, under the foregoing provisions of this Article "Second" (whether payable as advance royalty or ground rent or as royalty on ore shipped) until credit is thus taken for said entire sum of three hundred thousand dollars ($300,000.00). "It is agreed that this loan is made principally for the purpose of enabling the parties of the first part [the heirs] to pay the interest owing by them to the parties of the second part [the trustee], amounting to two hundred seventy-one thousand two hundred eighty dollars ($271,280.00) as of July 1, 1925, and this writing is authority and direction to the Trustee to apply so much of said three hundred thousand dollars ($300,000.00) as may be necessary to pay said indebtedness with interest thereon up to the date of the receipt of said three hundred thousand dollars ($300,000.00) the remainder, if any, to be paid over to the parties of the first part [the heirs] ratably in proportion to their respective interests hereinbefore set forth. * * *
"It is understood that the parties of the second part [the trustee] join in this instrument for the purpose of consenting *239 thereto and of subjecting all their right, title, interest and estate in and to the above described property to the operation of this lease as hereby amended, as though so amended before the execution and delivery of said indenture of trust of July 1, 1920, and that the estate or rights of the parties of the second part [the trustee] shall extend to the said lease as amended accordingly." The Federal estate tax return of the Estate of Wellington R. Burt, which was filed on August 23, 1920, included a valuation of Burt's Minnesota iron ore lands (subject to the leases thereon) based upon the estimated tonnage of unmined iron ore on the date of Burt's death on March 2, 1919. Subsequently on November 3, 1920, the executors of Burt's estate filed an affidavit claiming that the reported valuation should be decreased due to an error in computation. With respect to the iron ore land leased on January 1, 1900, to the Lake Superior Consolidated Iron Mines the return reported a value of $5,195,479 based on an estimated 54,012,682 tons and the subsequent affidavit claimed a reduced value of $5,110,803 based on the same tonnage. In fixing the Federal estate tax of the Estate of Wellington *240 R. Burt the decedent's fee ownership (subject to the lease) in the land leased on January 1, 1900, to the Lake Superior Consolidated Iron Mines, was valued by respondent at $5,497,576.43 on the date of his death on March 2, 1919. This value was based on an estimated 54,012,682 tons of ore in the ground and the use of the Hoskold formula, with a 6 per cent discount and 4 per cent yield factor, 3 per cent collection expense, 25-cent royalty, and 31-year life (the lease of January 1, 1900, expiring January 1, 1950), as follows: 54,012,682 tons X $.25 X.419724 (31 years) X 97% = $5,497,576.43. The above valuation assumed an average yearly production of 1,742,344.58 tons through the 31-year life of the lease, with a resulting depletion unit of $.1018 per ton. The above-mentioned 54,012,682 tonnage estimate, made by the executor of Burt's estate and used by the respondent in their respective valuations of the "Burt Lease," was based on an estimate prepared by the Minnesota Tax Commission for the purpose of fixing a state ad valorem tax. Under Minnesota law, since about 1908, the lessee was required to submit to the Minnesota Tax Commission annual reports on all explorations both by drilling *241 and by underground operations, and also to submit annual estimates of merchantable ore reserves, including therein all ore containing 55.81 per cent or over dry iron with 14 per cent moisture which is equivalent to natural ore containing 48 per cent iron. Merchantable ore is ore which, when encountered as mining progresses, can be taken out of the ore body, shipped, and sold at a profit. The estimates submitted by the lessee were checked for the Minnesota Tax Commission by the University of Minnesota School of Mines, the engineers of which made personal inspections of the mines each year to determine the accuracy of the lessee's reports and estimates. The tonnage estimates submitted to the Minnesota Tax Commission in 1919 by the lessee of the "Burt Lease" were estimated by the lessee's engineers in accordance with the best engineering and mining practices available at that time. Such estimates were based on the lessee's exploration sheets which recorded all data as to the location and footage of drill holes, and the analyses of the iron ore and other minerals encountered in the drill holes and underground operations. Further, the annual estimates of merchantable ore reserves, including *242 the one for the year 1919, were prepared primarily for the lessee's production planning and included only proven or developed ore. The types of ore bodies found on the "Burt Lease" properties were essentially two types, the deep through type ore body and the flat layered or so-called blanket type ore body. Proven or developed ore is ore which can be estimated with reasonable accuracy as to quantity and quality. It includes ore surrounded by drill holes and ore within a reasonable distance around the periphery of a group of drill holes. As a general rule, in estimating, a circle is drawn around a drill hole having a radius of twice the thickness of the ore body encountered in that hole, but not exceeding a maximum radius of 150 feet regardless of the thickness of the ore. In an ore body geological changes may occur within short distances and minable merchantable ore may become nonmerchantable ore or come to an abrupt stop against taconite. Proven or developed merchantable ore does not include the so-called probable or possible ore, or paint rock ore. Probable ore is that which might be expected to be found beyond the limits of the proven or developed ore body. Possible ore is that *243 which might possibly be found in subsequent exploration or exploitation of the ore bodies. Both probable and possible ores are speculative as to the existence and quality thereof. Paint rock is the leached and concentrated slating iron formation which occurs in the heart of the Mesabi Range taconite formation known as the lower slating division which is from 15 to 110 feet thick in different parts of the Range. The physical consistency of paint rock is sticky and plastic with a very high moisture content and (depending on the iron content) between 14 per cent to above 20 per cent silica content, between 4 per cent and 6 per cent alumina content, and between.08 per cent and.15 per cent phosphorus content, which makes it undesirable for the production of pig iron. Generally paint rock is not shipped as merchantable ore, except when unavoidably mixed in with other higher grade ore in the process of mining. When paint rock is encountered in underground operations it is customary to "cave" it, and in open pit operations to bypass it unless removal is necessary to mine other adjacent ore. The fair market value as of March 2, 1919, of Wellington R. Burt's fee ownership of the iron ore *244 lands, subject to the lease to the Lake Superior Consolidated Iron Mines (i.e., the "Burt Lease"), was $5,497,576.43 of which Marion A. Burt Beck's inherited undivided one-sixth interest was $916,262.74. For the years 1919 to 1937, inclusive, the respondent allowed Marion A. Burt Beck an aggregate amount of $590,140.42 as depletion on her interest in royalties under the "Burt Lease," with the depletion rate based in part on the above-mentioned valuation. For the years 1938 through 1941 the respondent determined that Marion A. Burt Beck's depletion allowance, on royalties under that lease, should be reduced (as recomputed in joint exhibit 8-H included herein by reference) in order to reflect a depletion rate per ton based on the remaining undepleted balance of her share of the 1919 value and the current estimated tonnage of ore reserves shown by the records of the Minnesota Tax Commission. For each of those years, 1938 through 1941, the recomputed depletion rate, as applied to the 2,750,000 tons on which royalty was paid under the "Burt Lease," resulted in an increase in the income reported by Marion A. Burt Beck for those years. Accordingly, for the years involved herein, the respondent *245 proportionately increased the income of Walter Beck, deceased, from the Walter Beck Trusts, the principal of which consisted in the aggregate of one-fourth of Marion A. Burt Beck's one-sixth undivided interest in the Burt iron ore properties and leases thereon. The Walter Beck Trust was established by an indenture dated November 22, 1937, whereby Marion A. Burt Beck transferred to herself and Watson Washburn as trustees an undivided one-twentieth of her one-sixth interest in the Burt iron ore lands, in trust for the benefit of her husband, Walter Beck. By a supplemental indenture dated January 8, 1938, Marion A. Burt Beck transferred an additional four-twentieths of her one-sixth interest in those ore lands to the same trustees for her husband's benefit. Those transfers in trust were specifically made subject to the mining leases of January 1, 1900, and July 1902 on the property involved and the lease extension agreement of January 1, 1926. Further, the transfers were made subject to a trust agreement of July 1, 1920, and certain supplements thereto between the Burt heirs and the Second National Bank of Saginaw, Michigan, as trustee, for the purposes, inter alia, of the trustee collecting *246 the royalties under the leases and making distribution thereof after applying certain sums therefrom to the repayment of the advance made to pay estate and inheritance taxes in respect to the said property, as hereinabove mentioned in connection with the compromise agreement of July 1, 1920, between the Burt heirs and the executor and trustee of the Burt estate. Marion A. Burt Beck's indenture in trust dated November 22, 1937, and supplemental indenture dated January 8, 1938, set forth the uses and purposes thereof, in part, as follows: "FIRST: To collect and receive the rents, royalties, interest, profits and income therefrom, remaining after the deduction of all payments required to be made under any of said several instruments specified in sections (a), (b), (c), (d), (e) and (f) above, and after reserving therefrom and preserving as a part of the principal of the said trust fund depletion at the rate of 40.4603 per cent. from said net receipts, to pay over the net income remaining to the Donor's husband, WALTER BECK, during his life, and upon his death to convey and assign all the real and personal property then constituting the corpus of the trust to the Donor. * * *" Marion *247 A. Burt Beck in her return for 1939 reported receipts from royalties in the gross amount of $88,983.87 and in the net amount of $36,644.99 after the deduction of "[depletion] and other expenses." In that year the Walter Beck Trust reported receipts of royalties in the gross amount of $29,661.29 and in the net amount of $12,214.99. In his return for the same year Walter reported income from fiduciaries in the total sum of $13,639.69. In her return for 1940 Marion reported income from royalties in the gross amount of $100,454.22 and in the net amount of $46,603.57. The Walter Beck Trust reported in its return for that year the receipt of royalties in the gross amount of $33,484.74 and in the net amount of $15,534.53. In Walter's return for the same year he reported income from fiduciaries in the amount of $17,036.55. In her return for 1941 Marion reported the receipt of royalties in the net amount of $46,604.82. The Walter Beck Trust reported for that year the receipt of royalties in the net amount of $15,534.94. In his return for the same year Walter reported the receipt of fiduciary income in the amount of $18,861.15. In all of the years the Walter Beck Trust reported the receipt *248 of some dividend income in addition to the royalties received and the fiduciary returns for those years showed the distribution to Walter of all of its net income. In the deficiency notice mailed to Walter Beck on December 21, 1954, the respondent's explanation of his adjustment was as follows: It is held that you understated your distributable share of income from the Walter Beck Trust dated November 22, 1937 for the taxable years ended December 31, 1939, 1940 and 1941 in the respective amounts of $7,736.79, $8,276.90 and $9,219.34 as set forth in Exhibit A attached hereto. Exhibit A sets forth the respondent's detailed computation for each of those years of the total gross royalties from the Burt iron ore properties and the taxable income for all of the Burt heirs; Marion Burt Beck's one-sixth share thereof less deductions for depletion and certain fees and her resulting net royalties; and one-fourth of Marion's net royalty for each year as income of the Walter Beck Trust. As a result of this computation respondent determined that the net royalties payable to Marion for 1939, 1940, and 1941 were in the respective amounts of $79,807.12, $95,204.36, and $98,994.20, and that *249 the royalty income of the Walter Beck Trust was one-fourth of these amounts. With respect to the taxable year 1938, not involved in this proceeding, an asserted income tax deficiency of the decedent was paid and suit for refund was brought by the executrix of his estate in the United States District Court for the Northern District of New York. That proceeding raised issues as to the proper allowance for depletion and the inclusion in the decedent's income of an amount paid out of royalties to the trustee under the compromise agreement of July 1, 1920, in repayment of estate and inheritance taxes. On February 27, 1958, the said District Court entered an order, as follows: "Upon the annexed stipulation of the parties hereto and it appearing that payment has been made to the plaintiff by the defendant, it is "ORDERED and ADJUDGED that said action be and the same hereby is dismissed as moot." Opinion KERN, Judge: We shall first consider the issue of the fair market value of Wellington R. Burt's fee interest in the iron ore lands subject to the "Burt Lease" at date of his death on March 2, 1919, for the purpose of determining the proper allowance for depletion on royalty payments. *250 In connection with this issue the petitioner argues that the Government's payment in settlement of the taxpayer's District Court suit for refund for 1938 constitutes a "declaration against interest" which deprives the respondent "of the benefit of any presumption as to the weight of the estate tax valuation" and also "of the usual presumption in favor of his determination." We find no merit in this argument. The District Court suit for refund for a taxable year not involved herein was not tried on the merits but instead was dismissed as moot. The instant case was tried de novo on the issues joined by the pleadings herein. The issue presented as to the fair market value of Burt's fee interest in iron ore lands subject to the "Burt Lease" on March 2, 1919, is a question of fact to be decided upon the facts of record herein. The burden of proof on this issue is upon the petitioner. See Rule 32 of this Court's Rules of Practice. It may be noted that at the outset of the hearing in the instant case the respondent withdrew his amended answer and abandoned his plea therein of res judicata or collateral estoppel based upon the decision in Marion A. Burt Beck, 15 T.C. 642, *251 affd. 194 F. 2d 537, certiorari denied 344 U.S. 821. The petitioner contends that the reserves of merchantable iron ore in the "Burt Lease" properties on March 2, 1919, amounted to 97,406,924 tons of ore; that the fair market value of Wellington R. Burt's fee interest in the iron ore lands subject to the "Burt Lease" at date of his death on March 2, 1919, was $12,405,670; and, further, that the proper depletion rate for Burt's heirs and the petitioner's decedent herein on their royalties was $.1345. In the case of Marion A. Burt Beck, supra, which considered the same problem of proper depletion with regard to the same property and which was decided in 1950, we made the following observation: "The determination of the fair market value of a property of the nature of petitioner's interest in the iron ore lands is difficult even if based on contemporary values. The task becomes increasingly difficult as the valuation date recedes in point of time. Here we are asked to fix the fair market value of this interest as of the time 31 years ago." We have carefully considered the record before us in the instant case, including the voluminous testimony *252 of the expert witnesses examined by both parties and the numerous charts and cross-section drawings introduced in evidence. It is our opinion that petitioner has failed to prove the fair market value of the property here involved as of the basic date to be in an amount different from that determined by respondent. On this record we have concluded and have found as a fact that the fair market value as of March 2, 1919, of Wellington R. Burt's fee ownership of the iron ore lands subject to the "Burt Lease" was $5,497,576.43 of which Marion A. Burt Beck's inherited one-sixth undivided interest was $916,262.74 for the purpose of determining the basis for the proper depletion allowance on royalty payments. Since Marion A. Burt Beck transferred an aggregate of one-fourth of her one-sixth interest in such lands to the Walter Beck Trust, it follows that the basis for determining the proper allowance for depletion on royalty payments to that trust and/or Walter Beck, deceased, was $229,065.69. The next issue is whether the respondent erred in making a downward revision of the depletion allowance for the taxable years under section 23(m) of the 1939 Internal Revenue Code. [1]
*253 This issue turns on the facts set out in our findings with respect to the respondent's downward revision in the depletion allowance on Marion A. Burt Beck's one-sixth interest in the iron ore property subject to the "Burt Lease," resulting in an increase in her income from such property. It is stipulated that the respondent proportionately increased the income of Walter Beck, deceased, from the Walter Beck Trust, the principal of which consisted in the aggregate of one-fourth of Marion's one-sixth interest in such property. The same issue involving a similar factual situation was considered by this Court in the case of Marion A. Burt Beck, supra, and decided adversely to petitioner's contentions herein challenging the propriety of the respondent's revision both as to the basis and the retroactive effect thereof. We reach the same conclusion reached in that case, and the respondent's revision of the depletion rate is approved with respect to the interest of the Walter Beck Trust and/or the beneficiary thereof, Walter Beck, deceased. The next two issues are whether the respondent erred in including in the decedent's gross income from the Walter Beck Trust a proportionate *254 share of the amounts withheld out of royalties in repayment of (1) an indebtedness for Federal estate and State inheritance taxes theretofore paid on behalf of the grantor of the Walter Beck Trust, and (2) an advance of $300,000 by the lessee to the lessors (one of which was Marion, the grantor of Walter's Trust) under the terms of a 1926 lease extension agreement on the iron ore property involved herein. For the purposes of this opinion those two issues may be considered together. In the case of Marion A. Burt Beck, supra at 663, this Court said that "the amounts representing the petitioner's share [Marion's share as one of the Burt heirs] of the royalty payments withheld by the lender-trustee in repayment of the loan were income to the petitioner, and we so hold." That decision obviously related only to the royalty income (including the amounts withheld for the repayment of both (1) and (2) debts above) of Marion A. Burt Beck at the time she created the Walter Beck Trust, which was held to be taxable to her on the ground that it was received by her or applied to the payment of her obligations. This case involves the tax liability, not of Marion or of her trusts but *255 of Walter as the life income beneficiary of the trust created by Marion. The question here is the amount of the income of the trust which was currently distributable to Walter, the beneficiary, during the taxable years. See section 162(b), Internal Revenue Code of 1939. It is hornbook law that if trust income is distributable to the beneficiary only after the payment of charges the beneficiary is only taxable on the net amount of the trust income after such charges. See Marion Shainwald Sevier, 14 B.T.A. 709, 717; Edith M. Bryant, 14 T.C. 127, 135, affd. 185 F. 2d 517. A fortiori, if the trust itself holds property upon which income is payable to the trust only after the payment of charges, only the net income of the trust could be currently distributable to the beneficiary. In the instant case the transfers by Marion to the Walter Beck Trusts aggregated the transfer of one-fourth of her one-sixth interest in iron ore lands and were specifically made subject to the leases on the property, the 1926 lease extension agreement, and all of the instruments creating the alleged debts of Marion and the provisions for repayments thereof, and the trustees *256 were empowered to "collect and receive" only "the rents, royalties, interest, profits and income therefrom, remaining after the deduction of all payments required to be made under any of said several instruments * * *." Regardless of the taxability of these payments to Marion as her income (as being in payment of her obligations), it seems obvious to us that they cannot be considered as income of the trusts currently distributable to Walter during the taxable years. [2]
Accordingly, we decide these issues in favor of petitioner. [3]
Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(m) Depletion. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case: such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each.↩
2. Accordingly, we are not required to consider petitioner's argument on these two issues, which is to the effect that the reserved payments were not income to Marion and therefore not income to Walter, which argument is contrary to our opinion in Marion A. Burt Beck, 15 T.C. 642, affd. 194 F. 2d 537, certiorari denied 344 U.S. 821↩.
3. Petitioner raises no question and makes no argument with regard to the provision in the trust instruments requiring the reservation of depletion as part of the trust principal.↩